IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| SCALEFACTOR, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | 1:19-CV-229-RP |
| PROCESS PRO CONSULTIN, LLC; | § | |
| ADAM SHARROW; and | § | |
| ANDREW MILLET; | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court is Plaintiff ScaleFactor, Inc.'s ("ScaleFactor") Motion for Entry of Temporary Restraining Order and Preliminary Injunction. (Dkt. 6). On March 13, 2019, the Court partially granted ScaleFactor's motion for a temporary restraining order after a telephonic hearing and set an in-person evidentiary hearing on whether to enter a preliminary injunction. (Dkt. 9). The Court held that hearing on March 21, 2019. (*See* Dkt. 23). Having considered the parties' briefs, the evidence, and the relevant law, the Court finds that the temporary restraining order should be dissolved and ScaleFactor's motion for preliminary injunction should be denied.

## I. BACKGROUND

ScaleFactor is business services company that seeks to solve "finance and accounting problems" for small businesses. (Rathmann Decl., Dkt. 6-2, at 2). ScaleFactor alleges that two former employees, Defendants Adam Sharrow ("Sharrow") and Andrew Millet ("Millet"), copied, deleted, or destroyed confidential and proprietary ScaleFactor documents and then formed a competing business, Process Pro Consulting LLC ("Process Pro"), in violation of their non-competition and -solicitation agreements. (*See* Compl., Dkt. 1). ScaleFactor also alleges that in their new business, Sharrow and Millet are using ScaleFactor's trade secrets. (*Id.*). Finally, ScaleFactor

1

alleges that because Sharrow and Millet purchased ScaleFactor stock while they were planning to compete with the company and use its trade secrets, ScaleFactor is entitled to rescind the stocks they bought. (*Id.*).

ScaleFactor seeks a preliminary injunction based on three causes of action: (1) against Sharrow, Millet, and Process Pro (collectively, "Defendants"), misappropriation of trade secrets under the federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.* ("DTSA"), and the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §§ 134A.001 *et seq.* ("TUTSA"); (2) against Sharrow and Millet, breach of their Proprietary Information and Inventions Agreements ("PIIAs"); and (3) against Sharrow and Millet, fraud, misrepresentation by omission, and breach of fiduciary duty.[1] (Compl., Dkt. 1, at 22–36, 41–44; Mot. Prelim. Inj., Dkt. 6, at 2–7). ScaleFactor asks the Court to enjoin Defendants from using or disclosing the company's trade secrets; to return all company property; to enjoin them from violating their non-competition and -solicitation agreements; from "providing business management services to small businesses"; and from transferring their ScaleFactor stock. (Proposed Order, Dkt. 6-1, at 4–5). Defendants responded to ScaleFactor's motion, (Dkt. 16), and the parties participated in an evidentiary hearing on March 21, 2019. (*See* Dkt. 23).

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

---

[1] ScaleFactor does not seek injunctive relief under the other causes of action stated in its complaint for violations of Computer Fraud and Abuse Act, 18 U.S.C. § 1030; the Texas Harmful Access by Computer Act, Tex. Civ. Prac. & Rem. Code § 143.001; and conversion. (*See* Compl., Dkt. 1, at 36–41).

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). To show a likelihood of success, the plaintiff must present a *prima facie* case, but need not prove that it is entitled to summary judgment. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

## III. DISCUSSION

For the reasons that follow, the Court finds that ScaleFactor has not demonstrated a substantial likelihood of success on any of the claims forming the basis of its motion. The Court will discuss each claim in turn.

### A. Breach of Contract

ScaleFactor argues that Sharrow and Millet are violating their non-competition agreements by founding and working for Process Pro. (Mot. Prelim. Inj., Dkt. 6, at 5). Sharrow and Millet respond that they are not in breach of the agreements because Process Pro does not compete with ScaleFactor. (Resp. Mot. Prelim. Inj., Dkt. 16, at 13–15).

Resolving this dispute turns in part on what each company does. ScaleFactor was founded to solve "finance and accounting problems" for small businesses. (Rathmann Decl., Dkt. 6-2, at 2). Its website advertises the company as offering "smart finance software" that "automat[es] complex bookkeeping tasks." (*Id.* at 20). ScaleFactor developed proprietary software that integrates and amplifies the effectiveness of commercially available software "that performs discrete finance and accounting tasks." (*Id.* at 4). ScaleFactor's customers get "streamlined financial and accounting operations such as bookkeeping, bill pay, invoice management, and payroll management." (*Id.*). Other ScaleFactor products and services include accrual accounting (tracking revenue and expenses when incurred), employee expense administration, Cash Vision (forecasting cash-on-hand), and BackTax (reviewing past tax returns). (*Id.*; ScaleFactor Descrip. Prods. & Servs., Defs.' Hr'g Exh. D).

ScaleFactor also makes operational recommendations based on a client's accounting and financial data, such as when to make a capital investment. (Rathmann Decl., Dkt. 6-2, at 5; Rathmann Hr'g Testimony). Its business model involves having ongoing business relationships with its customers, rather than completing discrete, one-time projects for them. (Rathmann Hr'g Testimony).

Process Pro, meanwhile, provides no accounting or finance products or services. (Sharrow Hr'g Testimony). Process Pro advises small- and medium-sized businesses on improving their sales and marketing processes and their "customer-success" processes. (*Id.*). Sharrow testified that he did not do any such consulting work at ScaleFactor and that ScaleFactor does not advise clients about sales, marketing, or customer-success processes. (*Id.*). Process Pro serves clients not through ongoing customer relationships, but through discrete, one-time projects. (*Id.*). Much of the company's work so far has involved implementing HubSpot, a third-party automation tool that helps businesses better follow up on leads. (*Id.*). Process Pro is not developing and does not use proprietary software to aid its advice to clients; that advice is based on Sharrow and Millet's experience. (*Id.*). Sharrow's unrebutted testimony is that Process Pro provides none of ScaleFactor's products or services. (*Id.*; *see* ScaleFactor Descrip. Prods. & Servs., Defs.' Hr'g Exh. D).

ScaleFactor believes that Process Pro is competing with it because Process Pro is "offering the same business process management services to the same types of small business customers." (Mot. Prelim. Inj., Dkt. 6, at 5). Even on a *prima facie* basis, only the latter is established by the evidence available at this stage. ScaleFactor has established only that Process Pro uses some of the same tools to advise clients, such as providing them with "dashboards" that identify "key performance indicators." (Sharrow Hr'g Testimony). But a key performance indicator is just a salient datapoint, and what's salient depends on what's being measured. Sales and marketing processes will have different key performance indicators than accounting processes. There is no evidence that sales-and-marketing process-management advice is the same as bookkeeping, bill-pay, or other

4

accounting and finance process-management advice. At bottom, ScaleFactor's theory of competition comes down to the fact that Process Pro is also a "small-business consultancy," (Rathmann Hr'g Testimony), which is why it seeks to restrain Defendants from "providing business process management services" of any kind to small businesses. (Proposed Order, Dkt. 6-1, at 4).

Whether such a broad conception of competition is contemplated by Sharrow and Millet's PIIAs depends on what the agreements mean by the term "compete." The PIIAs contain non-compete provisions in which Sharrow and Millet agree not to "participate in the operation, management or control of, any person, corporation, firm, or other entity that competes with [ScaleFactor's] business" for 12 months after termination. (*E.g.*, Sharrow PIIA, Dkt. 6-2, at 32).[2] The agreements do not define what it means to "compete" with ScaleFactor. (*See id.* at 26–39). Assuming the agreements are enforceable as written,[3] the Court must determine the parties' intended meaning of the term.

According to the PIIAs' choice-of-law provision,[4] Texas substantive law governs the contract claims. *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 993 (5th Cir. 2019). To determine the meaning of contractual terms, Texas courts focus on the parties' intentions as expressed in the contract itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). A court begins its analysis with a contract's express language, but if it finds the contract to be ambiguous because it is "subject to two or more reasonable interpretations," the court

---

[2] Sharrow and Millet's non-competition agreements extend to any state in the United States, or any foreign country, in which ScaleFactor does or plans to do business. (*E.g.*, Sharrow PIIA, Dkt. 6-2, at 32). There is no scope-of-activity restriction; the PIIAs prohibit Sharrow and Millet from competing with ScaleFactor in any capacity. (*Id.*).

[3] In Texas, "[e]very contract ... in restraint of trade or commerce is unlawful." Tex. Bus. & Com. Code § 15.05(a). "An agreement not to compete is in restraint of trade and therefore unenforceable . . . unless it is reasonable." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 (Tex. 1990). By statute, covenants not to compete are reasonable—and therefore enforceable—only to the extent that they contain "limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex. Bus. & Com. Code § 15.50(a). If a court finds that a covenant is unreasonable, it must reform the covenant so as to render it reasonable. Tex. Bus. & Com. Code § 15.51(c). Here, the Court need not consider whether the non-compete agreements are enforceable under Texas law, because it finds that it is not substantially likely that Sharrow and Millet are breaching their PIIAs as written.

[4] (*E.g.*, Sharrow PIIA, Dkt. 6-2, at 36).

may consider extraneous evidence to determine the contract's meaning. *Id.* at 333–34. Contract terms are given their plain, ordinary meaning unless the contract itself shows that the parties intended the terms to have a different, technical meaning. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004).

In the business context, there is some ambiguity to the term "compete." The dictionary definition—"to strive against another . . . to attain a goal, such as an advantage or victory"—is of little help here. THE AMERICAN HERITAGE DICTIONARY 376 (5th ed. 2011). In a world of finite resources, a dollar spent here is a dollar not spent there. A small business might use its available cash to hire an advertising agency to produce a series of video ads instead of hiring ScaleFactor to optimize their accounting operations. A small business struggling with inefficient processes in both its sales department and its accounting department may use its available cash to hire a consultant to address the former but not the latter. In a highly abstracted way, ScaleForce competes with every other business-services provider that markets to small- and medium-sized businesses.

But the evidence at this stage suggests that ScaleFactor does not conceive of competition so broadly. Asked to identify its primary competitors, ScaleFactor CEO Kurt Rathmann ("Rathmann") identified small (1–20 employees) local accounting firms, Pilot (a bookkeeping software and services company), and Ceterus (an accounting software and services company). (Rathmann Hr'g Testimony). These businesses are not competitors simply because they are "small-business consultancies"; they are competitors because they offer the same (or substitutable) services as ScaleFactor to the same type of customers to which ScaleFactor markets its services. Meanwhile, there is no evidence at this stage that the parties intended "compete" to apply to any company that provides business-process consulting to small businesses, (*see* Reply Mot. Prelim. Inj., Dkt. 21, at 4), even those whose consulting work focuses exclusively on business processes—such as sales, marketing, or human resources—for which ScaleFactor does not provide consulting services.

6

For the purpose of deciding this motion, the Court therefore finds that the PIIAs define "compete" to mean providing the same or similar services to small- and medium-sized businesses. Under that definition, Process Pro is not competing with ScaleFactor. Although they provide business-process consulting services to small- and medium-sized businesses, they provide no products or services that pertain to accounting or finance processes. ScaleFactor has therefore not demonstrated a substantial likelihood of proving that Sharrow and Millet are breaching their non-compete agreements.[5]

### B. Trade Secrets

ScaleFactor argues that Sharrow and Millet have "misappropriated ScaleFactor's trade secrets by making unauthorized use and disclosure of ScaleFactor's trade secrets to create and provide Process Pro with the ability to provide the same services as and improperly compete with ScaleFactor." (Mot. Prelim. Inj., Dkt. 6, at 4). Sharrow and Millet object that ScaleFactor's trade secrets are vaguely defined and deny using any trade-secret information. (Resp. Mot. Prelim. Inj., Dkt. 16, at 9–13).

Under both the DTSA and TUTSA, a trade secret is defined as information the owner has taken reasonable measures to keep secret and which derives independent economic value from not being generally known or readily ascertainable through proper means. Tex. Civ. Prac. & Rem. Code § 134A.002(6); 18 U.S.C. § 1839(3). Misappropriation under both statutes includes (1) "disclosure or use of a trade secret of another without express or implied consent by a person who . . . used improper means to acquire knowledge of the trade secret" and (2) "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." Tex. Civ. Prac. & Rem. Code § 134A.002(3); 18 U.S.C. § 1839(5). "Improper

---

[5] Again, this assumes that the PIIAs are enforceable as written. Left undecided is whether it would be reasonable to define "compete" as broadly as ScaleFactor proposes, as well as whether the PIIAs are reasonable according to their temporal, geographic, and scope-of-activity restrictions. *See* Tex. Bus. & Com. Code § 15.50(a).

means" include the "breach or inducement of a breach of a duty to maintain secrecy." Tex. Civ. Prac. & Rem. Code § 134A.002(2); 18 U.S.C. § 1839(6)(A).

ScaleFactor argues that its trade secret information at issue includes specific things such as the source code for its proprietary software ("Flightpath"), customer lists, marketing strategies, and internal financial information. (Compl., Dkt. 1, at 22).[6] This sort of information can be a trade secret. *See* Tex. Civ. Prac. & Rem. Code § 134A.002(6) (listing "business . . . information" such as "financial data [or a] list of actual or potential customers"); *Glob. Water Grp., Inc. v. Atchley*, 244 S.W.3d 924, 928 (Tex. App.—Dallas 2008, pet. denied) ("Customer lists, pricing information, client information, customer preferences, buyer contacts, blueprints, market strategies, and drawings have all been recognized as trade secrets.").

> To determine whether a trade secret exists under Texas law, courts examine:
>
> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of the measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003).[7] A trade secret must actually be a secret: the owner must take "reasonable measures under the circumstances to keep the information secret" and the information must derive economic value from not being generally known or readily ascertainable through proper means. Tex. Civ. Prac. & Rem. Code § 134A.002(6). "Consistent with this concept of secrecy, a former employee may use the general knowledge, skills, and experience acquired during employment to compete with a former employer."

---

[6] ScaleFactor also identifies more generic information: "designs, processes, procedures, and other information relating to business processes, process mapping, change management, process configuration, and business process automation." (Compl., Dkt. 1, at 22). The Court does not decide whether this sort of information can constitute a trade secret because, for the reasons discussed in this order, it finds that there is not a substantial likelihood that Defendants have misappropriated any of ScaleFactor's trade secrets.

[7] Not every factor will apply to a purported trade secret. *Glob. Water Grp.*, 244 S.W.3d at 928.

*Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 467 (Tex. App.—Austin 2004, pet. denied).

Texas law provides that both actual and threatened misappropriation may be enjoined. Tex. Civ. Prac. & Rem. Code § 134A.003(a). Accordingly, the weight of case law supports the entry of an injunction upon a showing that a defendant probably, rather than actually, disclosed trade secrets. *See Cardoni v. Prosperity Bank*, 805 F.3d 573, 590 (5th Cir. 2015) (holding that a district court correctly "made an individualized assessment of whether disclosure had occurred or was likely to occur in this case"). Such a showing can be made by proving that a defendant is "in possession of the information and is in a position to use it." *Fox v. Tropical Warehouses, Inc.*, 121 S.W.3d 853, 860 (Tex. App.—Fort Worth 2003, no pet.); *see also Conley v. DSC Communications Corp.*, 05-98-01051-CV, 1999 WL 89955, at *5 (Tex. App.—Dallas Feb. 24, 1999, no pet.); *Rugen v. Interactive Bus. Sys., Inc.*, 864 S.W.2d 548, 552 (Tex. App.—Dallas 1993, no writ). At this preliminary stage, a court does not determine that the information at issue is a trade secret, only "whether the applicant has established that the information is entitled to trade-secret protection until the trial on the merits." *Ctr. for Econ. Justice v. Am. Ins. Ass'n*, 39 S.W.3d 337, 343 (Tex. App.—Austin 2001, no pet.). ScaleFactor has not made such a showing.

Certainly, Sharrow and Millet had access to trade-secret information while they were at ScaleFactor. They were senior employees. For example, Sharrow "worked extensively" on Flightpath's development. (Sharrow Aff., Dkt. 16-2, at 3). Millet is familiar with ScaleFactor's confidential financial information from his position as Director of Tax Services and with ScaleFactor's confidential information about its business operations and software functionality from his position as Direct of Solutions and Customer Experience. (*See* Millet Aff., Dkt. 16-1, at 2). Given

their recent departure from ScaleFactor, it is reasonable to presume that Sharrow and Millet have not forgotten every piece of trade-secret information they learned there.

But possession of trade-secret information is only half of the analysis; Defendants must also be "in a position to use it." *Fox*, 121 S.W.3d at 860.[8] Here, the evidence favors Defendants because it fails to establish that they are substantially likely to use the trade-secret information they retain. Process Pro does not use and is not developing any proprietary software, much less software like Flightpath. (Sharrow Aff., Dkt. 16-2, at 13). And although the Court agrees that information like ScaleFactor's marketing and pricing strategies or its internal financial information "holds value for competitors" who can use that information to "undercut [ScaleFactor's] prices and target its customers," (Compl., Dkt. 1, at 24), the Court credits Defendants' testimony that they cannot take clients from ScaleFactor because Process Pro provides different services in a different way. (*See* Millet Aff., Dkt. 16-1, at 10). Likewise, it may be true that ScaleFactor has trade-secret approaches to optimizing finance and accounting tasks, including their software-driven "insights" that help the company scale up the amount of quality advice it gives. (*See* Compl., Dkt. 1, at 24; Rathmann Hr'g Testimony). But Process Pro is not in a position to use those approaches because it does not provide accounting or finance products or services, and it does not use proprietary software to generate insights to aid its advising. (*See* Sharrow Aff., Dkt. 16-2, at 12–13; Sharrow Hr'g Testimony). And finally, some of the trade-secret information discussed at the hearing is simply not secret. For example, Rathmann observed that Process Pro, like ScaleFactor, appears to be using HubSpot to generate and follow up on leads. (Rathmann Hr'g Testimony). What HubSpot does is not a secret, and Process Pro's use of the service (if they are using it) suggests only that Sharrow and Millet are applying their general knowledge and experience about running a business to their new

---

[8] Alternatively, there could also be direct evidence that Defendants are using or disclosing trade secrets, but none is present here.

venture. The Court finds that ScaleFactor has failed to demonstrate Defendants have probably used or disclosed trade secrets.[9]

### C. Fraud, Misrepresentation, and Breach of Fiduciary Duty

Finally, ScaleFactor argues that Sharrow and Millet's purchases of ScaleFactor stock violated their stock option contract and constituted fraud, misrepresentation, and breach of fiduciary duty, entitling ScaleFactor to rescission of the stock. (Mot. Prelim. Inj., Dkt. 6, at 5–6). Because ScaleFactor does not assert a cause of action for fraud, the Court will look only to the latter two bases for injunctive relief.

ScaleFactor correctly points out that Delaware law provides for rescission of a contract based on misrepresentations by a contracting party. (Mot. Prelim. Inj., Dkt. 6, at 6 (citing *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032 (Del. Ch. 2006))).[10] But rescission is an equitable remedy that is only available when damages are unavailable or inadequate to do justice. *Marina View Condo. Ass'n of Unit Owners v. Rehoboth Marina Ventures, LLC*, CV 2017-0217-PWG, 2018 WL 1172581, at *6 (Del. Ch. Mar. 6, 2018), *adopted*, (Del. Ch. 2018). Likewise, a preliminary injunction is available only where the potential injury to the plaintiff is irreparable. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir. 1985). ScaleFactor argued at the hearing that it would be difficult for them to unwind a series of transactions if Sharrow or Millet

---

[9] Significant attention was paid at the hearing to the fact that (a) Millet factory-reset his company laptop on the day he resigned, (b) Sharrow copied company information to a thumb drive on the day he resigned and later destroyed that thumb drive, and (c) Sharrow and Millet deleted all of their Slack conversations before resigning. Although such evidence might support an inference that Sharrow and Millet misappropriated trade secrets and then covered their tracks, it is not clear that such an inference is warranted here. Millet and Sharrow testified that they feared that they would lose access to their company laptops after resigning and wanted to make sure that they copied and deleted personal information from their company hardware. (Millet and Sharrow Hr'g Testimony). Sharrow testified that he never opened or copied the information from the USB drive and destroyed it to ensure he did not possess any ScaleFactor proprietary information. (Sharrow Hr'g Testimony). Because Process Pro is significantly different from ScaleFactor and is not competing with ScaleFactor, it is unlikely that Sharrow and Millet would have reason to use trade-secret information retained on the thumb drive. Viewing the mixed evidence in that context, the Court declines to infer that Defendants have used or disclosed trade secrets.

[10] Delaware law applies to Sharrow and Millet's stock purchase agreements based on the agreements' choice-of-law provision. (Stock Option Agreement, Dkt. 6-2, at 189).

were to sell their stock. (*See also* Mot. Prelim. Inj., Dkt. 6, at 9 (arguing that its other remedies would be less practical and efficient)). ScaleFactor has not shown that damages would be unavailable or that the harm it would suffer it Sharrow or Millet sold their ScaleFactor stock would be irreparable. At most, ScaleFactor has established that its ultimate remedy if it prevails on this claim might be inconvenient. That showing is not enough to warrant the entry of extraordinary preliminary relief.

## IV. CONCLUSION

For the reasons given above, **IT IS ORDERED** that ScaleFactor's Motion for Entry of Temporary Restraining Order and Preliminary Injunction, (Dkt. 6), is **DENIED**. The temporary restraining order previously entered by the Court, (Dkt. 9), is **DISSOLVED**.

**SIGNED** on March 22, 2019.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE